C. J. Tower & Sons *v.* United States (No. 4112)[1]

United States Court of Customs and Patent Appeals, April 25, 1938

*Joseph R. Jackson,* Assistant Attorney General (*William Whynman,* special attorney, of counsel), for the United States.
*Barnes, Richardson & Colburn* (*Samuel M. Richardson* of counsel) for appellant.

[Submitted on briefs February 10, 1938]

Before Garrett, Presiding Judge, and Bland, Hatfield, and Lenroot, Associate Judges

Hatfield, Judge, delivered the opinion of the court:[2]

This is an appeal from a judgment of the United States Customs Court, Second Division.

Merchandise consisting of pulpboard, imported in rolls, was assessed for duty by the collector at the port of Buffalo, N. Y., as pulpboard, "vat-lined," at 30 per centum ad valorem under paragraph 1413 of the Tariff Act of 1930.

The importer protested the collector's assessment of duty, claiming that the merchandise was properly dutiable as pulpboard, "not * * * vat-lined," at only 10 per centum ad valorem under paragraph 1402 of that act.

The pertinent provisions of the paragraphs in question read:

Par. 1402. Paper board, wallboard, and *pulpboard,* including cardboard, and leather board or compress leather, *not* plate finished, supercalendered or friction

---

[1] T. D. 49575.
[2] Jackson, Judge, took no part in the consideration or decision of this case.

calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or *vat-lined*, embossed, printed, decorated or ornamented in any manner, nor cut into shapes for boxes or other articles and not specially provided for, 10 per centum ad valorem. * * * [Italics ours.]

PAR. 1413. Papers and paper board and pulpboard, including cardboard and leather board or compress leather, embossed, cut, die-cut, or stamped into designs or shapes, such as initials, monograms, lace, borders, bands, strips, or other forms, or cut or shaped for boxes or other articles, plain or printed, but not lithographed, and not specially provided for; paper board and *pulpboard*, including cardboard and leather board or compress leather, plate finished, supercalendered or friction calendered, laminated by means of an adhesive substance, coated, surface stained or dyed, lined or *vat-lined*, embossed, printed, or decorated or ornamented in any manner; press boards and press paper, all the foregoing, 30 per centum ad valorem * * *. [Italics ours.]

It appears from the record that the imported merchandise was manufactured in Canada by a "continuous process," which, according to the importer's witness P. W. Codwise (a chemist in the employ of the manufacturer, · Beaver Wood Fibre Co., of Ontario, Canada, owned and controlled by the Certain-teed Products Corporation, the importer of the involved merchandise), was a "vat-lining process." The witness described the process as follows:

This product has been made on a six-cylinder board machine. In the first four cylinders the material is the same, and that material is prepared from waste products, such as old newspapers, and· is prepared in beaters or mixers—we call them beaters—and it is run into a chest, and then it is run from the chest into a Jordan, and then into another chest, and then run on the four cylinders of the machine. Upon the other two cylinders, the last two cylinders, the stock is new pulp, namely, ground wood, and that is prepared in a separate chest, run into a separate Jordan, and then into a separate chest, and then on the last two cylinders of the machine, making six cylinders altogether. The finished board is made on a six-cylinder, a multi-cylinder, board machine which is in common use. I think that will describe it.

\* \* \* \* \* \* \*

These cylinders are run in a vat slightly larger than—I believe the cylinder is forty-eight inches in diameter, maybe forty-two inches; I think it is forty-eight inches. There are six of those in a series and there is a continuous felt that runs along and picks the layer of stock from the first cylinder, and it is caught and there is a roller above it that presses it. Then the felt goes on to the next cylinder and picks this layer from it and· it goes on to another cylinder. This layer is always on the bottom of the felt, and finally after the sixth cylinder it goes through a press roller.

We quote further from the testimony of the witness, relative to the process used in the manufacture of the involved material:

Q. The two last cylinders which you said have slightly different material from the first four cylinders; is that material which appears upon these exhibits upon which writing is placed?—A. Correct.

\* \* \* \* \* \* \*

Q. What is the difference, chemically, if you can give it, between the material in the two last vats and that in the first four?—A. Chemically, I would say there was practically no difference. It is a matter of appearance.

Q  What is that difference in appearance?—A. Well, we are using our work stock, dirty stock, in the first four, whereas we are using clean, new stock, in the last two.

Q. Is there any coloring matter in the last two cylinders?—A. Yes; there is Bismarck brown and Metmil yellow.

Q. About what percent is there of that coloring matter?—A. Approximately, five to six ounces of each to a ton.

Q. Does that increase or decrease the value of the merchandise?—A. No, sir.

Q. Did you ever ship merchandise composed only of the material in the first four cylinders?—A. Well, I would say our center stock is of that general character.

Q. That is on the four cylinders?—A. Yes.

Q. It is all the same material?—A. Yes.

Q. The only difference between that and the merchandise here under consideration is in the last two cylinders there is a slight amount of coloring matter and it is made out of cleaner material?—A. Yes.

Q. No other difference?—A. I do not think so.

 *  *  *  *  *  *  *

X Q. Do those horizontal cylinders which revolve separate the stock?—A. Yes.

X Q. Each produces a separate layer of paper?—A. Yes.

X Q. The layers are carried along the machine and while still moist are combined into one sheet by pressure without the use of adhesive?—A. Yes.

 *  *  *  *  *  *  *

R. Q. The first four layers are prepared and attached together just exactly as the two last layers are attached to the completed first four; is that correct?—A. Yes.

R. Q. Mr. Codwise, that is from the manufacturing standpoint known as a vat lining process; is it not?—A. It is.

The witness identified Exhibits 1 to 5, inclusive, as representative of the involved merchandise. So far as the issues here are concerned, such differences as may exist in the exhibits are of no consequence.

The importer's witness Roswell F. Thoma, president of the Roswell F. Thoma Paper Box Co. (manufacturer of paper boxes out of "vat-lined board" and "lined board"), stated that his company used so-called "chipper board, vat-lined, or what is known as news board, vat-lined"; that the involved merchandise, or at least that of which Exhibits 2 and 3 are representative, "has lining board on it"; that it might be news vat-lined board; and that, due to insufficient strength, it was unsuitable for the type of paper boxes manufactured by his company. The witness then stated:

A lined board—if I talk wrong it is not because I intend to—is a piece of paper pasted on board with an adhesive. Vat-lined board, as I understand it, has a lining with a lighter color on one side or perhaps on two sides of the board which is produced in the manufacture of the board originally and costs less money than sheets of paper. We might have customers that want a hard board paper box, lined, and other customers that would want something that would not cost so much and they would use a vat-lined board.

The witness H. G. Schlegel, testifying for the importer, said that he was employed as salesman by the Certain-teed Products Corporation; that merchandise like that here involved was sold by him to

manufacturers of paper board and gypsum board; that it is sold as "liner"; that it is not sold under the name "vat-lined board"; and that it is used in the manufacture of "so-called fibre board."

Paul E. Fischer also testified for the importer. He said that he was plant superintendent of the "fibre board plant in Buffalo of the Certain-teed Products Corporation"; that merchandise like that here involved was used by his company in the manufacture of "fibre wall board"; and that, in the manufacture of "fibre wall board," his concern "put liners on each side and the centers are made of different material." He further said that, so far as he knew, merchandise like that here involved is used only as a material in the manufacture of wallboard.

It appears from the testimony of one of the Government's witnesses, Arthur J. Loman, employed by the Tonawanda Box Board Co. as plant manager, that merchandise like that of which Exhibits 3 and 4 are representative is known as "cream liner," and is used "as wall board liner"; that "The word 'wall board' may or may not be added"; and that—

In regard to the name by which it is ordered, it is called cream wall board liner. In my understanding—and I have been in the manufacturing end of the business for a long time—any board in which a different or distinct kind of pulp is used as a liner is vat-lined board, and under that general heading, I would call that vat-lined board.

After analyzing the testimony, the trial court held that the merchandise was manufactured by a vat-lining process; that it was pulpboard, vat-lined; and that, as the statutory term "vat-lined" was descriptive, proof of commercial designation of the involved merchandise was irrelevant, its trade terminology being immaterial. In the course of its discussion, the court stated that paragraph 1413, *supra*, plainly provided for pulpboard, vat-lined in the process of manufacture, but that, if there could be any possible doubt as to the meaning of the provisions in question, the legislative history clearly confirmed the court's construction of them.

It is contended by counsel for appellant that the involved merchandise is excluded from the provisions of paragraph 1413, *supra*, for pulpboard, "vat-lined," for the following reasons: First, because it is a material used in the manufacture of wallboard described in paragraph 1402, *supra;* second, it is not "included in the name 'vat-lined board' in the trade and commerce of the United States"; and third, the legislative history indicates a congressional intent to exclude merchandise of the character of that here involved from the provisions of paragraph 1413, *supra*.

It is conceded by counsel for appellant that the imported merchandise was manufactured "by a vat-lined process." So far as this record is concerned, the only use of practical importance shown for the

involved merchandise is that of a material for the manufacture of fiber board and wallboard.

In its report to accompany H. R. 2667 (which later became the Tariff Act of 1930), the Senate Finance Committee reported, under "Schedule 14.—Papers and Books," pages 42 and 43, relative to paragraphs 1402 and 1413, *supra*, in part as follows:

> In paragraph 1402, which provides for nonprocessed paper board, wall board, and pulpboard, including cardboard, and leatherboard or compress leather, the committee rephrased the processing terms employed with a view of eliminating ambiguities. No change in rates is made in this paragraph.

> \* \* \* \* \* \* \*

> Lined board under the present law (Tariff Act of 1922) is held to be board to the surface of which a liner (outside or exposed layers) has been pasted after the board was manufactured. Vat-lined board is board to which a liner is applied in the form of a layer of pulp at the time of manufacture in one process and is classified for duty as an unlined board. Vat-lined board competes in the trade with lined board, and the term "lined or vat-lined" is here used to indicate a board which has been lined by means of pasting or which has been produced in the form of a layer of pulp at the time of manufacture in one process.

> The same terms used in paragraph 1402 to describe processed boards are repeated in paragraph 1413.

Counsel for appellant contend that it clearly appears from the report of the Senate Finance Committee that only such vat-lined board as was competitive "with lined board and was ready for such use in its imported condition" was intended to be included within the provisions of paragraph 1413, *supra*; that is, that what the Congress had in mind was *"finished vat-lined pulpboard."*

It is true that the committee stated in its report that "Vat-lined board competes in the trade with lined board." However, it also stated that the—

> term "lined or vat-lined" is here used to indicate a board which has been *lined by means of pasting or which has been produced in the form of a layer of pulp at the time of manufacture in one process.* [Italics ours.]

It is clear, if the report of the Senate Finance Committee is to be given any consideration, that the Congress intended to provide in paragraph 1413, *supra*, for pulpboard "vat-lined \* \* \* at the time of manufacture in one process." That being so, it is immaterial whether the committee was or was not correctly informed with regard to competition in trade between *vat-lined* pulpboard and *lined* pulpboard; nor does it matter, in view of the congressional intent, by what name or names pulpboard like that here involved is bought and sold in the trade and commerce of the United States, or whether or not it is competitive with lined pulpboard. It may be observed in this connection that it has not been established by the evidence of record that the involved merchandise is not competitive with "lined pulpboard."

It clearly appears from the record that the involved merchandise is pulpboard; that it was manufactured by a "vat-lining process"; and that it is vat-lined. It is, therefore, in our opinion, dutiable as pulpboard, vat-lined, under paragraph 1413, *supra*, as held by the trial court.

The judgment is *affirmed*.